# United States District Court
# For the District of Columbia

_____

)
**SYSTEMS ENGINEERING AND**                                    )
**SECURITY, INCORPORATED**,                                    )
7474 Greenway Center Drive, Suite 700                          )
Greenbelt, Maryland 20770-3523                                )
                                                              )
        **and**                                             )
                                                              )
**MAHESH C. MITTAL, PH.D.**                                    )
C/O Systems Engineering and                                   )
Security, Incorporated                                        )
7474 Greenway Center Drive, Suite 700                          )
Greenbelt, Maryland 20770-3523                                )
                                                              )
     *EX REL*                                            )
                                                              )
SERVE:   Kenneth L. Wainstein                           )
           Interim United States Attorney                )
           for the District of Columbia                  )
           Judiciary Center                              )
           555 Fourth Street, N.W.                       )
           Washington, D.C. 20530-0001                   )
                                                              )
                                                              )
                                                              )
                                                              )
                                                              )
                                                              )

SERVE:   Alberto R. Gonzales      )
            Attorney General         )
            Room 5111             )
            Tenth Street and        )
            Constitution Avenue, N.W. )
            Washington, D.C. 20530-0001 )
                                       )

           **v.**                       )   Civil Action No.  05-  (  )
                                       )

**SCIENCE & ENGINEERING**       )
**ASSOCIATES, INCORPORATED** )
100 Sun Avenue, NE, Suite 500    )
Albuquerque, New Mexico 87109-4670 )
                                      )

           **and**                   )
                                        )

**ROBERT A. SAVOIE**           )
159 East Oakridge Park         )
Metairie, Louisiana 70005-4018   )
                                      )

           **and**                   )
                                        )

**VICE ADMIRAL DANIEL T. OLIVER,** )
**USN (RET.)**                    )
President, Science & Engineering    )
Associates, Incorporated         )
100 Sun Avenue, NE, Suite 500    )
Albuquerque, New Mexico 87109-4670 )
                                      )

           **and**                   )
                                       )
                                       )
                                       )

- 2 -

**WILLIAM E. "BILL" LOWRY**                          )
Vice President, Science & Engineering                )
Associates, Incorporated                             )
100 Sun Avenue, NE, Suite 500                        )
Albuquerque, New Mexico 87109-4670                   )
                                                     )
    **and**                      )
                                                     )
**APOGEN TECHNOLOGIES,**                             )
**INCORPORATED**                                     )
7819 Jones Branch Drive, Suite 400                   )
McLean, Virginia 22102-3319                          )
                                                     )
    **and**                      )
                                                     )
**PHILIP A. ODEEN**                                  )
Chairman, Board of Directors                         )
Apogen Technologies, Incorporated                    )
7819 Jones Branch Drive, Suite 400                   )
McLean, Virginia 22102-3319                          )
                                                     )
    **and**                      )
                                                     )
**TODD A. STOTTLEMYER**                              )
Chief Executive Officer                              )
Apogen Technologies, Incorporated                    )
7819 Jones Branch Drive, Suite 400                   )
McLean, Virginia 22102-3319                          )
                                                     )
    **and**                      )
                                                     )
                                                     )
                                                     )
                                                     )

**PAUL G. LESLIE**                    )
President & Chief Operating Officer   )
Apogen Technologies, Incorporated    )
7819 Jones Branch Drive, Suite 400   )
McLean, Virginia 22102-3319          )
                                     )
     **Defendants**.                 )
_____

## COMPLAINT

### NATURE OF THE ACTION

1.  Plaintiffs seek relief under the False Claims Act, 31 U.S.C. §§ 3729-3733. Plaintiffs seek recovery of civil penalties as a result of false and/or fraudulent claims made by Science & Engineering Associates, Incorporated, Albuquerque, New Mexico (SEA) and its former, and its current, Officers; and by Apogen Technologies, Incorporated, McLean, Virginia (Apogen), and its current Officers and a Director. These false and/or fraudulent claims have been, and are currently, being made by SEA and by Apogen under Task Orders issued against a Blanket Purchase Agreement awarded by the Federal Technology Service, Greater Southwest Region, United States General Services Administration, Fort Worth, Texas to SEA on August 31st, 2000. Plaintiffs assert: (1) that SEA, Apogen, and their current and former Officers, and a current Director of Apogen, have conspired, and are conspiring, and have, and are falsely and

fraudulently representing, that SEA was, and is, an eligible small business; (2) that SEA, Apogen, and their current and former Officers, and a current Director of Apogen, well knew and know, or should have known, that SEA is a large business not entitled to any preference as a small business, either in 2000 or today; (3) that SEA received award of the Blanket Purchase Agreement promised under Project FG170GN001, the "Information Technology Center Integration Project," for Federal information technology support services as a result of these representations; (4) that SEA and Apogen are presenting to the United States General Services Administration, Washington, D.C. 20405-0001 periodic claims for payment for Federal information technology support services delivered under Task Orders issued against the Blanket Purchase Agreement; and (5) that SEA and/or Apogen, or both, is/are receiving payments on behalf of the Federal Technology Service, United States General Services Administration on these claims for delivery of Federal information technology support services that are being presented under Task Orders issued against the Blanket Purchase Agreement.

PARTIES

2.  Plaintiff Systems Engineering and Security, Incorporated, Greenbelt, Maryland (Systems Engineering) is a small business that has since 1989 delivered Federal information technology support services to the United States and others, and Systems Engineering is a corporation organized and existing under the laws of Virginia. Plaintiff Mahesh C. Mittal, Ph.D., is the President and CEO of Systems Engineering. The remaining party Plaintiff is the United States, acting through the Federal Technology Service, United States General Services Administration. Defendant SEA is a New Mexico corporation whose principal place of business is in Albuquerque, New Mexico. Defendant Apogen is a Delaware corporation whose principal place of business is in McLean, Virginia. Defendant Robert A. Savoie was formerly the President of SEA, and was formerly the Vice Chairman of Apogen. Defendant Vice Admiral Daniel T. Oliver, USN (Ret.) is Apogen's Sector President, National Security, and the President of SEA. Defendant William E. "Bill" Lowry is Apogen's Senior Vice President, Energy & Technology Services, and a Vice President of SEA. Defendant Philip A. Odeen is Chairman of the Board of Directors of Apogen. Defendant Todd A. Stottlemyer is Chief Executive Officer of Apogen. Defendant Paul G. Leslie is President & Chief

- 6 -

Operating Officer of Apogen. Defendants SEA; Apogen; Robert A. Savoie; Vice Admiral Daniel T. Oliver, USN (Ret.); William E. "Bill" Lowry; Philip A. Odeen; Todd A. Stottlemyer; and Paul G. Leslie are hereinafter referred to, collectively, as "the Defendants."

3. Systems Engineering has standing to pursue this Action. Systems Engineering was the only other Offeror competing for the award of the Blanket Purchase Agreement promised under Project FG170GN001. Systems Engineering and Dr. Mittal have a personal stake, a competitive interest in assuring that the Blanket Purchase Agreement promised under Project FG170GN001 was fairly awarded to an eligible small business. *United States ex rel. Amin, et al. v. George Washington University*, 26 F. Supp. 162, 165-68 (D.D.C. 1998).

JURISDICTION AND VENUE

4. This Court has jurisdiction under 31 U.S.C. § 3730(b)(1) and 28 U.S.C. § 1331. Proscribed acts occurred in this District.

5. Venue is proper in this Court under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b)(2).

- 7 -

6.  This Action is timely filed under 28 U.S.C. § 2415(a) and 31 U.S.C. § 3731(b)(1) within six years after the first dates on which violations were committed.

AVERMENTS

A New Federal Procurement.

7.  On July 25th, 2000 the General Services Administration's Federal Technology Service, with offices in Fort Worth, Texas announced Project FG170GN001, the "Information Technology Center Integration Project." This Project was undertaken to support the Department of the Navy's Space and Naval Warfare Systems Command's Information Technology Center located in New Orleans, Louisiana. The Project was a competition among holders of General Services Administration Multiple Award Schedule contracts for a single Blanket Purchase Agreement that would be effective for a base period of twelve months and could be renewed over four option years. This single Blanket Purchase Agreement would be awarded to the General Services Administration Multiple Award Schedule contractor that offered the "best value," as specified in Federal Acquisition Regulation 8.404(d), 8.405-2(d).

8.  Project FG170GN001 required that any General Services Administration Multiple Award Schedule contractor competing for award of the promised single

Blanket Purchase Agreement "shall be a small business . . . ." Project FG170GN001 announced, in the Instructions, Conditions, and Notices to Offerors, that "[t]his solicitation is issued exclusively for small business participation as the prime contractor/team leader." Likewise Project FG170GN001 announced in the Instructions, Conditions, and Notices to Offerors that "[o]n a yearly basis, no individual large business will perform more than 10% of the work." The Instructions, Conditions, and Notices to Offerors issued with Project FG170GN001 required "[o]n the first page of the price proposal, state whether or not the price proposal has been prepared completely consistent with the requirements of this solicitation and the FAR [Federal Acquisition Regulation]."

9.   In the first set of published Questions and Answers that were exchanged before submission of responses to Project FG170GN001, the General Services Administration explained that the price competition would be based on Offeror's pricing for commercial services, and that the annual ten percent limitation on subcontracting work to a large business would be calculated based on the annual total dollars billed for support services. Here are the colloquies:

4.    The Department of Labor Wage Determination Schedule (WDS) was not addressed in the RFP. Would you please indicate which labor categories are Exempt and which are Non-exempt, provide the appropriate WDS', and provide the required mapping from the RFP labor categories into the WDS.

**ANSWER:    This requirement is being competed using GSA Schedules SINS 132-51. Services under GSA Schedule are considered commercial services. . . .**

. . . .

11.    The RFP states that no single Large Business may perform more than 10% of the work effort. Does the 10% apply to dollars or hours?

**ANSWER:    Dollars**

. . . .

20.    Is the 10% constraint placed on large business participation calculated using dollars or labor hours?

**ANSWER:    Dollars**

10. In the second set of published Questions and Answers that were exchanged before submission of responses to Project FG170GN001, the General Services Administration explained that Federal Acquisition Regulation Part 8.4, "Federal Supply Schedules," not Parts 15 or 19, was applicable, and that Project FG170GN001 was limited to small business participation only:

- 10 -

11.   (Vendor Name) does not understand the Government's response to question #1. What is the Small Business four digit SIC code and size standard associated with this procurement?

**ANSWER:  GSA is using Schedule 70, SIN 132-51, IT Professional Services. It is important to understand that this solicitation is being issued under FAR Part 8 and not FAR Part 15. FAR Part 8 covers the use of GSA FSS Schedules. When using GSA Schedules, the Government can "limit" the evaluation to small businesses. The vendors that have been selected to participate in the acquisition have all been classified as a small business under their GSA Schedule 70, SIN 132-51, IT Professional Services.**

11. Applicable law in 2000 provided that a competition among holders of General Services Administration Multiple Award Schedule contracts for a promised Blanket Purchase Agreement was itself a Federal "procurement," 41 U.S.C. § 603(2), separate and distinct from the competitions for the General Services Administration Multiple Award Schedule contracts that had preceded it. *Ellsworth Associates, Inc. v. United States*, 45 Fed. Cl. 388, 395-96 (1999); *Intelligent Decisions, Inc.*, B-274-626; B-274626.2, December 23rd, 1996, at 5-6.

12. Under applicable Small Business Size Regulations, the size status of a business concern would be determined as of the date of the business concerns' response to the competition preceding a Federal "procurement:"

- 11 -

> Generally, SBA [the United States Small Business Administration] determines the size status of a concern (including its affiliates) as of the date the concern submits a written self-certification that it is small to the procuring agency as part of its initial offer including price. . . .

13 C.F.R. § 121.404 (2000).

Size Standard.

13. Project FG170GN001 did not specify the size standard by which status as a small business was to be determined. Nonetheless, Project FG170GN001 did carefully specify the labor categories, and the type of work, that was to be delivered under the promised Blanket Purchase Agreement. In fact, this type of work is delivered by these labor categories from firms that are classified under Standard Industrial Classification codes 7371, "Computer Programming Services;" 7373, "Computer Integrated Systems Design;" 7374, "Computer Processing and Data Preparation and Processing Services;" 7375, "Information Retrieval Services;" 7376, "Computer Facilities Management Services;" and 7379, "Computer Related Services, Not Elsewhere Classified."

14. In 2000, the size standard for a firm to be considered as a small business in these Standard Industrial Classification codes was, uniformly, maximum annual re-

ceipts of $18,000,000. 13 C.F.R. § 121.201 (2000). The United States Small Business Administration then measured, and does now, maximum annual receipts by totaling the annual receipts of a concern over its last three completed fiscal years and dividing by three. 13 C.F.R. § 121.104(b) (2000). A "small business" concern was then, and is now, an entity whose maximum annual receipts are less than the maximum annual receipts set out in the applicable size standard. 13 C.F.R. § 121.101 (2000).

15. Federal Acquisition Regulation 8.405-5(a) then provided:

> Although the mandatory preference programs of Part 19 do not apply, orders placed against schedule contracts may be credited against the ordering activity's small business goals. *For purposes of reporting an order placed with a small business schedule contractor, an ordering agency may only take credit if the awardee meets a size standard that corresponds to the work performed.* Ordering activities should rely on the small business representations made by schedule contractors at the contract level.

Emphasis added.

16. In 2000, case law held that in General Services Administration Multiple Award Schedule procurements, a concern's size would be determined as of the date of that concern's latest self-certification, and that this self-certification could be implicitly made in a response to a General Services Administration Multiple Award

Schedule procurement. *Size Appeal of Whitecraft Industries, Inc.*, United States Small Business Administration Office of Hearings and Appeals Number 2016, Docket Number SIZ-84-6-28-118, August 30th, 1984. Applicable law in 2000 was not different than applicable law today. Case law holds also that even though a competition among holders of General Services Administration Multiple Award Schedule contracts that is expressly restricted to small business concerns does not contain a Standard Industrial Classification code or size standard, that competition is indeed restricted to small businesses although it lacks an announced Standard Industrial Classification code or size standard; and that the appropriate date to determine such a small business concern's size is the date of the small business concern's response to such a competition among holders of General Services Administration Multiple Award Schedule contracts. *Size Appeal of Advanced Management Technology, Inc.*, United States Small Business Administration Office of Hearings and Appeals Number 4638, Docket Number SIZ-2003-11-25-71, June 1st, 2004; *Size Appeals of SETA Corporation, Federal Emergency Management Agency*, United States Small Business Administration Office of Hearings and Appeals Number 4477, Docket Numbers SIZ-2001-06-01-17, -18, March 1st, 2002.

The Competition.

17. Systems Engineering was added by staff at the Department of the Navy's Space and Naval Warfare Systems Command's Information Technology Center to the list of General Services Administration Multiple Award Schedule contractors asked to compete for the promised Blanket Purchase Agreement under Project FG-170GN001, and Systems Engineering decided to compete for this business after it had received the letter and its enclosures that announced the competition. Systems Engineering was then, and is now, a small business as well as a small disadvantaged business. Systems Engineering's maximum annual receipts for calendar year 2000, and to this day, have not exceeded $18,000,000. Systems Engineering submitted a voluminous response on August 15th, 2000 and offered an evaluated price, over the five-year life of the promised Blanket Purchase Agreement, of some $750,600,000. Systems Engineering computed its offered prices with a profit margin of 7.5 per-cent, or approximately $56,000,000.

18. SEA likewise submitted its response under Project FG170GN001 on August 15th, 2000. SEA's response included an executed Blanket Purchase Agreement as Volume I; as Volume II, its written proposal for offered experience and past per-

formance; and as Volume III, its price proposal. In Volume II, "Overview," at page II-3, SEA represented that SEA "is a privately held, employee-owned small business . . . ." As required by the Instructions, Conditions, and Notices to Offerors issued with Project FG170GN001, at page III-3 of Volume III, SEA represented that "[t]o the best of our knowledge and belief, this proposal has been prepared completely consistent with the requirements of the solicitation, and applicable sections of the Federal Acquisition Regulation (FAR)." The cover letter of SEA's response is signed by Robert A. Savoie, then the President of SEA.

19. SEA offered an evaluated price, over the five-year life of the promised Blanket Purchase Agreement, of over $1 billion. Systems Engineering believes that SEA's profit margin was, and is, in excess of 9 percent, or about $90,000,000.

20. Only Systems Engineering and SEA competed for award of the promised Blanket Purchase Agreement. Systems Engineering and SEA both made oral presentations as a part of their responses to Project FG170GN001. The presentations were made to General Services Administration personnel and to personnel from the Department of the Navy's Space and Naval Warfare Systems Command's Information Technology Center. Systems Engineering made its presentation in New Or-

leans, Louisiana on August 24th, 2000. During this presentation, Government personnel made it clear that Project FG170GN001 was exclusively for small business participation, and thus Systems Engineering emphasized its status as a small business as well as a small disadvantaged business.

The Blanket Purchase Agreement.

21. On August 31st, 2000, less than one week after the oral presentations, Systems Engineering was notified by letter that the promised Blanket Purchase Agreement had been awarded to SEA. This Blanket Purchase Agreement is now Blanket Purchase Agreement BPA Number GS-07-T00BGD0070.

22. Because Systems Engineering had offered a lower evaluated price than SEA, Federal Acquisition Regulation 8.405-2(d) required a debriefing. Systems Engineering received the debriefing that it had requested in New Orleans, Louisiana on September 7th, 2000. Personnel from the General Services Administration and from the Department of the Navy's Space and Naval Warfare Systems Command's Information Technology Center conducted the debriefing. At the debriefing, these personnel confirmed that Project FG170GN001 was exclusively for small business participation, that SEA had won on a "best value" basis even though SEA's evaluated

price was some 35 percent higher than System Engineering's evaluated price, that only two responses had been received, and that SEA had won in what was a close contest.

23. Since 1998 SEA had been the incumbent contractor at the Department of the Navy's Space and Naval Warfare Systems Command's Information Technology Center providing the Federal information technology support services that were awarded to SEA for continued performance in 2000 under Blanket Purchase Agreement BPA Number GS07T00BGD0070. In February 2005 Systems Engineering learned that the value of these support services previously provided by SEA amounted to some $50,000,000.

24. In a telephone call with Dr. Mittal on September 8th, 2000 Robert A. Savoie, then the President of SEA, offered to give Systems Engineering substantial subcontracts if Systems Engineering did not protest, and promised a "strategic alliance" with Systems Engineering for teaming on other business. Systems Engineering then had no reason to question SEA's status as a small business, and Systems Engineering elected not to contest the award to SEA. Robert A. Savoie subsequently represented on many occasions that SEA was a small business and that Systems Engine-

ering and SEA thus could team on numerous other business opportunities. No such opportunities were ever offered to Systems Engineering. At a holiday party in December 2003 Robert A. Savoie said to Dr. Mittal that he could not offer Systems Engineering subcontracts under Blanket Purchase Agreement BPA Number GS-07-T00BGD0070 because SEA "already had many subcontractors."

Discovery of the Fraud.

25. Telephone listings as of January 6th, 2003 for the Department of the Navy's Space and Naval Warfare Systems Command's Information Technology Center show (in alphabetical order) the company affiliations of listed persons, including persons employed by SEA. Persons employed by SEA are shown with these company affiliations: Affiliated Computer Services, Incorporated (ACS); BearingPoint, Incorporated; Booze Allen Hamilton; CACI, Incorporated—Federal (CACI); Diamond Data Systems, Incorporated (DDS); and Science Applications International Corporation (SAIC). Other SEA employees are shown as employed by SEA's affiliate, SEA Information Services, Incorporated (SEA-IS). These telephone listings show 347 persons at the Department of the Navy's Space and Naval Warfare Sys-

tems Command's Information Technology Center who were in January 2003 working under Blanket Purchase Agreement BPA Number GS-07-T00BGD0070.

26. CACI was in 2003, and is now, a large business. CACI has been a large business at least since Blanket Purchase Agreement BPA Number GS-07-T00BGD0070 was awarded to SEA in 2000 as a result of the competition conducted under Project FG170GN001. CACI's work as a subcontractor for SEA at the Department of the Navy's Space and Naval Warfare Systems Command's Information Technology Center involves high-level database modeling efforts for the Defense Integrated Military Human Resources System (DIMHRS). Because Federal information technology support services provided by CACI are complex, CACI's subcontract work under Blanket Purchase Agreement BPA Number GS-07-T00BGD0070 is paid at higher rates than the average hourly rates for other SEA subcontractors.

27. The first set of Questions and Answers exchanged before Blanket Purchase Agreement BPA Number GS-07-T00BGD0070 was awarded to SEA twice explained that the ten percent limitation on large business participation applies to the annual total dollars billed. Systems Engineering knows neither the annual total dollars for support services billed by SEA and all of its subcontractors nor the annual total

dollars for support services billed by CACI. Nonetheless, of the 347 people delivering Federal information technology support services for SEA at the Department of the Navy's Space and Naval Warfare Systems Command's Information Technology Center in January 2003, 48 people were employed by CACI. This is significantly more than 10 percent of the total number of people employed there by SEA and all of its subcontractors, and, on information and belief, CACI's annual total dollars for support services billed under Task Orders issued against Blanket Purchase Agreement BPA Number GS-07-T00BGD0070 is also significantly higher than 10 percent of the annual total dollars for all support services billed under Task Orders issued against Blanket Purchase Agreement BPA Number GS-07-T00BGD0070.

28. In January 2004 SEA merged with ITS Services, Incorporated (ITS). In June 2004 SEA and ITS announced that the merged companies would continue operations as Apogen. Apogen today holds all of the capital stock of SEA. On its web page (http://www.apogentech.com/?PageID=1), Apogen claims to be the "parent corporation" of SEA. In 2004 Robert A. Savoie was listed as the Vice Chairman of Apogen.

29. On October 12th or 13th, 2004 Dr. Mittal met in New Orleans, Louisiana with Anthony Jones, the Controller of the Department of the Navy's Space and Naval Warfare Systems Command's Information Technology Center. Dr. Mittal was in New Orleans in connection with an "Industry Day" briefing for the competition for the successor contract to Blanket Purchase Agreement BPA Number GS-07T00BG-D0070 (this successor contract was to be competed on an unrestricted basis, but has now been released as a total set-aside for small businesses). Anthony Jones told Dr. Mittal that all non-Navy work was being removed from Blanket Purchase Agreement BPA Number GS-07-T00BGD0070 and that estimated billings on Task Orders issued against Blanket Purchase Agreement BPA Number GS-07-T00BG-D0070 for Federal fiscal year 2005 would be only $50 to $55 million. Anthony Jones said that billings under Blanket Purchase Agreement BPA Number GS-07T00BG-D0070 in prior Federal fiscal years were as follows: 2004-$75 to $80 million, 2003-$75 to $80 million, 2002-$60 million, and 2001-$60 million. Anthony Jones began his employment at the Department of the Navy's Space and Naval Warfare Systems Command's Information Technology Center after the competition for Blanket Purchase Agreement BPA Number GS-07-T00BGD0070 in 2000. Anthony Jones said

- 22 -

that he was "pretty sure" that neither Apogen nor SEA was a small business concern, and said that he "doubted" SEA could have been considered a small business concern in 2000.

30. At the same time he was in New Orleans, Dr. Mittal spoke with Anthony Nida, an employee of SEA and Apogen. Employees of SEA and Apogen who work on-site at the Department of the Navy's Space and Naval Warfare Systems Command's Information Technology Center wear badges identifying them as employees of Apogen. Dr. Mittal asked Anthony Nida about the small business size status of SEA. Anthony Nida then told Dr. Mittal that SEA is not a small business, that SEA's annual receipts range from $100 to $150 million, and that SEA has not been a small business for at least six or seven years because SEA's annual receipts were in the $40 to $50 million range prior to the competition in 2000 for Blanket Purchase Agreement BPA Number GS-07-T00BGD0070.

31. On April 4th, 2005 Systems Engineering received a Dun & Bradstreet Business Information™ Report on SEA. This Report shows that SEA's annual receipts in 2003 were $108,074,721. On June 17th, 2005 Systems Engineering obtained a copy of a news report from *Washington Technology* showing annual receipts for SEA as

follows: 1998-$18,400,000, 1999-$37,800,000, 2000-$61,400,000, 2001-$78,400,00, and 2002-$93,400,000.

32. SEA's registration data in the Government's *Central Contractor Registration* continue to show SEA as offering services in Standard Industrial Classification codes 7371, "Computer Programming Services;" 7373, "Computer Integrated Systems Design;" 7376, "Computer Facilities Management Services;" and 7379, "Computer Related Services, Not Elsewhere Classified."

33. Today, Standard Industrial Classification codes have been replaced by the North American Industry Classification System. The corresponding codes are as follows: 7371 replaced by 541511, 7373 replaced by 541512, 7376 replaced by 541-513, and 7379 replaced by 541519. The size standard today is $21,000,000 in maximum annual receipts. 13 C.F.R. § 121.201 (2005). The United States Small Business Administration's Small Business Size Regulations continue to measure maximum annual receipts by totaling annual receipts of a concern over its last three completed fiscal years and dividing by three. 13 C.F.R. § 121.104(b) (2005). A "small business" concern continues to be an entity whose maximum annual receipts are less

than the maximum annual receipts set out in the applicable size standard. 13 C.F.R. § 121.101(a) (2005).

34. Blanket Purchase Agreement BPA Number GS-07-T00BGD0070 establishes a total Task Order limitation of $1,053,116,455.29. All of the four options available under Blanket Purchase Agreement BPA Number GS-07-T00BGD0070 have been exercised. Modification 10 to Blanket Purchase Agreement BPA Number GS-07-T00BGD0070 exercises, at paragraphs numbers 20 and 23, the third option, this for the period September 1st, 2003 through August 31st, 2004, and the fourth option, this for the period September 1st, 2004 through August 31st, 2005.

35. On information and belief, both the General Services Administration and the Department of the Navy's Space and Naval Warfare Systems Command's Information Technology Center, in Federal fiscal year 2000, and to this day, have taken credit for Task Orders issued against Blanket Purchase Agreement BPA Number GS-07-T00BGD0070 as Task Orders placed with a General Services Administration Multiple Award Schedule small business contractor.

<u>False And/Or Fraudulent Claims</u>.

36. SEA could not have been a small business contractor under the applicable United States Small Business Administration size standard in 2000 when it submitted its price proposal in the competition for Blanket Purchase Agreement BPA Number GS-07-T00BGD0070, and its representations to the contrary in its response under Project FG170GN001 were false and fraudulent. Taking just the annual receipts for SEA that were reported in *Washington Technology* for 1998 ($18,400,000) and 1999 ($37,800,000) and assuming that SEA's annual receipts for 1997 were zero (which can hardly be true), the resulting three-year average is $18.73 million, well above the maximum annual receipts established in the United States Small Business Administration's size standards for these Standard Industrial Classification codes. SEA's average annual receipts for the years 2000 through 2003 are significantly above the United States Small Business Administration's size standards for these Standard Industrial Classification codes. Indeed, these average annual receipts are significantly above today's size standard of $21,000,000 in maximum annual receipts.

37. After its merger with Apogen SEA acquired an additional disqualification—
under applicable United States Small Business Administration Small Business Size
Regulations, business concerns are considered to be affiliates of each other when
officers, directors, or managing members of one business concern also control the
management of another business concern, 13 C.F.R. § 121.103(e) (2005); or when
business concerns having "substantially identical business or economic interests"
are economically dependent on one another through contractual or other relation-
ships, 13 C.F.R. § 121.103(f) (2005). If a small business concern is found to be affili-
ated with a large business concern, this small business concern is deemed to be a
large business concern, and it is not eligible to be treated as a small business con-
cern, 13 C.F.R. § 121.103(a)(1) (2005) ("It does not matter whether control is exer-
cised, so long as the power to control exists.").

38. Per its own website, Apogen claims to be the "parent corporation" of SEA.
Apogen's registration data in the Government's *Central Contractor Registration*
show that Apogen is a large business. Apogen, the "parent corporation" of SEA, is
clearly affiliated with SEA through common management and control, 13 C.F.R. §

121.103(e) (2005), and thus SEA is not eligible to be treated as a small business concern, 13 C.F.R. § 121.103(a)(1) (2005).

39. SEA was not a small business concern in 2000 at the time it submitted its price proposal in the competition for Blanket Purchase Agreement BPA Number GS-07-T00BGD0070, SEA was not a small business concern at any time from 2000 to the present, and SEA is not a small business concern today. Apogen has never been a small business concern. SEA is not now, was not at any time from 2000 to the present, and was not before the award of Blanket Purchase Agreement BPA Number GS-07-T00BGD0070 in 2000, eligible to be treated as a small business concern.

40. Both SEA and Apogen and their senior Officers and Directors well knew, and know, or should have known, that SEA is not a small business concern, yet Apogen actively assisted and promoted SEA as a small business concern before the General Services Administration and at the Department of the Navy's Space and Naval Warfare Systems Command's Information Technology Center from 2000 through 2005. Representations to the contrary, including the invoices being presented for the Federal information technology support services being delivered by

SEA and Apogen under Task Orders issued against the Blanket Purchase Agreement, are continuing frauds on the United States. As a result of these continuing frauds, SEA and Apogen are continuing to receive Task Orders for Federal information technology support services from the General Services Administration and from the Department of the Navy's the Space and Naval Warfare Systems Command's Information Technology Center, and under these Task Orders, SEA and Apogen are presenting claims for payment, and are being paid, for Federal information technology support services rendered. These acts are violations of 31 U.S.C. § 3729(a)(1), (2), and (3).

41. SEA, which was not a small business concern on August 15th, 2000 when it submitted its price proposal in the competition for Blanket Purchase Agreement BPA Number GS-07-T00BGD0070 and then represented that SEA was "a privately held, employee owned small business . . .", was in January 2003 likewise not in compliance with the ten percent yearly limitation on large business participation under Blanket Purchase Agreement BPA Number GS-07-T00BGD0070. On information and belief, this noncompliance with the ten percent yearly limitation on large business participation under Blanket Purchase Agreement BPA Number GS-

07-T00BGD0070 existed from the date of award of Blanket Purchase Agreement BPA Number GS-07-T00BGD0070 through January 2003, and this noncompliance continues today. Representations to the contrary, including the invoices being presented for the Federal information technology support services being delivered by CACI under subcontract to SEA and Apogen, are continuing frauds on the United States, and violations of 31 U.S.C. § 3729(a)(1), (2), and (3).

Voluntary Disclosure.

42. Systems Engineering has by letters dated Friday, July 22nd, and Tuesday, July 26th, 2005 made the voluntary disclosures to the United States (to an Assistant United States Attorney in the Office of the United States Attorney for the District of Columbia and to a Trial Attorney at the Civil Division, United States Department of Justice) of the information on which this False Claims Act Complaint is based. These voluntary disclosure were made as required by 31 U.S.C. § 3730(e)(4).

COUNT I
THE DEFENDANTS ARE COMMITTING
SPECIFIC ACTS THAT PROVIDE A BASIS FOR LIABILITY.

43. Plaintiffs incorporate and re-allege paragraphs numbers 1. through 42. hereinabove as if fully set forth herein.

44. The Defendants are receiving Task Orders for Federal information technology support services from the United States General Services Administration, and under these Task Orders, the Defendants are presenting claims for payment, and are being paid, for services rendered. These acts are violations of 31 U.S.C. § 3729-(a)(1), (2), and (3).

### Count II
### The Defendants Are Knowingly
### Submitting False Claims.

45. Plaintiffs incorporate and re-allege paragraphs numbers 1. through 42. herein-above as if fully set forth herein.

46. The Defendants are making representations that SEA is an eligible small business. These representations are false, and Defendants are making these representations with actual knowledge of the falsity, else out of deliberate indifference, else out of reckless disregard for the truth.

### Count III
### The Defendants Are Making
### Claims for Payment.

47. Plaintiffs incorporate and re-allege paragraphs numbers 1. through 42. herein-above as if fully set forth herein.

- 31 -

48. The Defendants are making periodic requests for payment of money for deliveries of Federal information technology support services under Task Orders placed by the United States General Services Administration. The Defendants are receiving periodic payments of money on behalf of the United States General Services Administration based on these claims.

49. Periodic requests for payment submitted under Task Orders where representations are, or have been previously, made that the firm is an eligible small business themselves represent an implied certification, and these periodic requests cause disbursements to be made by the United States in the mistaken belief that these payments further the aims of the Small Business Act, 15 U.S.C. § 644. Such periodic requests abuse the Small Business Act, 15 U.S.C. § 644, and impose a societal cost that is recompensed with the $10,000 penalty that can be imposed for submission of each such periodic request. 31 U.S.C. § 3729(a); *Ab-Tech Construction, Inc. v. United States*, 31 Fed. Cl. 429, 434-35 (Fed. Cl. 1994), *aff'd per curiam*, 57 F.3d 1084 (Fed. Cir. 1995). Withholding information on implied certifications such as these (here, the knowledge that SEA is not an eligible small business) is recognized as the

hallmark of a False Claim. *United States v. TDC Management Corp.*, 288 F.3d 421, 426-27 (D.C. Cir. 2002), *cert. denied* 537 U.S. 1048 (2002).

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court award a civil penalty of $10,000 for each periodic request for payment submitted by the Defendants under Task Orders issued against Blanket Purchase Agreement BPA Number GS-07-T00BGD0070, and that this Court grant such other and further relief as may be just and proper.

Respectfully submitted,

/s/ Cyrus E. Phillips, IV

_____
Cyrus E. Phillips, IV
D.C. Bar Number 456500

Suite 660
1828 L Street, N.W.
Washington, D.C. 20036-5112

Telephone:        (202) 466-7008
Facsimile:        (202) 466-7009
Electronic Mail: lawyer@procurement-lawyer.com

Attorney of record for Plaintiff,
Systems Engineering and Security, Incorporated.

- 33 -